**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CINCINNATI INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | No. _19-cv-6912_____ |
| | ) | |
| v. | ) | Hon. _____ |
| | ) | |
| FLEETWOOD ALUMINUM PRODUCTS, | ) | Mag. J. _____ |
| INC., | ) | |
| | ) | |
| Defendant. | ) | |

**CINCINNATI INSURANCE COMPANY'S
COMPLAINT FOR DECLARATORY JUDGMENT**

Plaintiff Cincinnati Insurance Company brings this action for declaratory judgment against Fleetwood Aluminum Products, Inc. and states as follows:

1.      This is a declaratory judgment action brought pursuant to 28 U.S.C § 2201 and 28 U.S.C. § 1332 to determine the rights and obligations of the parties under a commercial general liability insurance policy.

2.      This action will resolve a dispute between Cincinnati Insurance Company ("Cincinnati") and Fleetwood Aluminum Products, Inc. ("Fleetwood") as to whether Fleetwood is entitled to coverage under a commercial general liability policy that Cincinnati issued to non-party Assured Construction Corporation ("Assured"), in relation to a lawsuit filed against Fleetwood in Minnesota.

**PARTIES, JURISDICTION AND VENUE**

3.      Cincinnati Insurance Company is a corporation organized under the laws of Ohio with its principal place of business in Ohio.  For the purposes of 28 U.S.C. § 1332, Cincinnati is a citizen of Ohio.

1

4.      Fleetwood Aluminum Products, Inc. is a corporation organized under the laws of California with its principal place of business in California.  For the purposes of 28 U.S.C. § 1332, Fleetwood is a citizen of California.

5.      Fleetwood is engaged in the business of manufacturing windows and doors that are used in residential applications and sold through a network of authorized Fleetwood dealers.

6.      Bruce Barnett and Judith Barnett ("the Barnetts") live in Minnesota. The Barnetts are not sued in this Lawsuit because they have agreed to be bound by the outcome of this coverage lawsuit.

7.      The Barnetts filed a lawsuit against several defendants regarding problems with their newly-built home. Their claims against Fleetwood seek damages caused by Fleetwood windows and doors that were installed in their home.

8.      Fleetwood has claimed that Cincinnati owes Fleetwood a defense indemnification of any damages that may be awarded against Fleetwood in connection with the Barnett Lawsuit. The Barnett Lawsuit seeks more than $50,000.00 in damages, including a request to replace, or remove and repair, the Fleetwood products from the home. The exposure to Cincinnati, including the cost of defending Fleetwood and the damages sought from Fleetwood, exceeds $75,000.00.

9.      Jurisdiction for this matter is secure under 28 U.S.C. § 1332.  The parties are of diverse citizenship and the amount in controversy exceeds the jurisdictional minimum.

10.      Venue is appropriate under 28 U.S.C. § 1391(b)(2).  The insurance policy at issue was issued to Assured Construction in Illinois, the named insured on the policy

resides in Illinois, and most of the transactions related to Fleetwood's claim for insurance coverage under the insurance policy at issue arose in Illinois.

## BACKGROUND

### A. Underlying Suit

11. This insurance coverage dispute arises out of a construction defect and/or product liability lawsuit filed by the Barnetts against Fleetwood and others. The underlying suit is captioned as *Bruce Barnett, et al. v. Streeter & Associates, Inc., et al.* ("the Barnett Lawsuit"). The Barnett Lawsuit was filed in Minnesota state court on or about September 28, 2018, and was assigned case number 27-cv-18-16494. (A copy of the Barnett Complaint is attached as Exhibit A.)

12. The Barnetts allege that they contracted to build a new home in Woodland, Minnesota. (Exh. A, ¶ 1.)

13. The Barnetts entered into contracts with Peterssen/Keller, Inc. ("PKA"), under which PKA agreed to provide architectural and other services for the new home. (Exh. A, ¶ 5.)

14. The Barnetts contracted with Streeter & Associates, Inc. ("Streeter"), under which Streeter agreed to serve as the general contractor for the new home. (Exh. A ¶ 6.)

15. The Barnett Lawsuit alleges that, per PKA's specifications, Streeter purchased Fleetwood doors and windows for the home. Streeter purchased the Fleetwood products through Assured Construction Corp. ("Assured"), a dealer for Fleetwood products. (Exh. A ¶ 20.)

16.     The order for the Fleetwood windows and doors was submitted to Fleetwood through Assured in or about April 2014.

17.      The Barnett Lawsuit alleges that the "window and door systems" specified by PKA were inappropriate for the home being built.  (Exh. A ¶ 21.)

18.     The Barnett Lawsuit alleges that Streeter installed the Fleetwood doors and windows in the new home.  (Exh. A ¶ 21.)

19.     The home was certified for occupancy in September, 2015.  (Exh. A ¶ 9.)

20.     The Barnett Lawsuit alleges that in December 2016 the Barnetts noticed that condensation and frost would develop on the home's window and door frames during cold weather.  (Exh. A ¶ 19.)

21.     The Barnett Lawsuit alleges that the specified Fleetwood windows and doors are defective in their "use of a non-thermally-broken sill pan" and installation. These defects "resulted in thermal bridging and frost under anticipated weather conditions."  The Barnett Lawsuit alleges this has "permitted, and will continue to permit, damage to the home."  (Exh. A ¶¶ 21, 23.)

22.     The Barnett Lawsuit seeks in excess of $50,000.00 in damages.  (Exh. A ¶¶ 38, 46, 53.)

23.     The Barnett Lawsuit asserts the following three (3) counts:

      a.     Count I is for breach of contract and express warranties against all defendants.

      b.     Count II is for negligence against all defendants.

      c.     Count III is for breach of Ch. 327A Warranties against Streeter.

24.     To recap the relevant roles alleged in the Barnett Lawsuit, PKA specified certain windows and doors that were to be installed in the Barnett home.  Fleetwood

4

manufactured those windows and doors. Streeter purchased the Fleetwood windows and doors through Fleetwood's dealer, Assured. Streeter and/or Streeter's subcontractors installed the Fleetwood windows and doors in the home. (Exh. A ¶¶ 8, 21.)

B.    **Fleetwood's Business Relationship to Assured**

25.    Fleetwood's products are sold through dealers. Assured prepared the paperwork by which Streeter purchased the Fleetwood doors and windows for the Barnett home.

26.    From time to time, Fleetwood asked Assured to sign a Dealer Agreement prepared and provided by Fleetwood.

27.    Assured and Fleetwood entered into a Dealer Agreement on or around March 23, 2012 (the "2012 Agreement"). A sheet titled "Terms & Conditions" provided that Assured was to reimburse Fleetwood for defense fees and costs incurred for any lawsuit in which Fleetwood is a party by reason of (a) its relationship with Assured or (b) any act or omission of Assured. The 2012 Agreement did not require Assured to indemnify Fleetwood for any liability to a third party, nor did it require Assured to assume any tort liability on behalf of Fleetwood. (A copy of the relevant portion of the 2012 Agreement is attached as Exhibit B).

28.    After the Barnett order was submitted to Fleetwood, Assured and Fleetwood entered into another signed Dealer agreement on or around July 31, 2014 (the "2014 Agreement"). On information and belief, the 2014 Agreement did not contain a "Terms & Conditions" sheet. The 2014 Agreement did not contain any terms requiring

Assured to indemnify Fleetwood or to assume any tort liability on behalf of Fleetwood. (A copy of the relevant portion of the 2014 Agreement is attached as Exhibit C).

29.     Fleetwood attempted to negotiate a new Dealer agreement with Assured in 2016 and again in 2018. Assured rejected the terms provided by Fleetwood for those agreements, and did not sign those documents. Assured ceased any business relationship with Fleetwood in 2018.

30.     On or around January 11, 2019, Fleetwood sent a request for defense and indemnity to Assured for the Barnett Lawsuit. The request referred to Fleetwood's "rights" under the "most recent dealership agreement"; asserted that Fleetwood was an additional insured under the Cincinnati policy issued to Assured; and suggested that Assured might "be able to satisfy its obligations through the coverage provided under that policy." (A copy of the January 11, 2019 letter is attached as Exhibit D).

31.     On or around January 25, 2019, Fleetwood filed a Third-Party Complaint against Assured. The Third Party Complaint alleges that Assured breached its "contracts" with Fleetwood; sought contractual indemnity from Assured; and sought contribution from Assured in the event of Fleetwood's liability in the Barnett Lawsuit. (A copy of Fleetwood's Third Party Complaint [without exhibits] is attached as Exhibit E).

C.     **Cincinnati's Coverage Dispute with Fleetwood**

32.     The first notice to Cincinnati of any issue with the Barnett home was in January 2019.

33.     On or around February 8, 2019, Cincinnati sent correspondence to counsel for Fleetwood, explaining why the Cincinnati policy provided no coverage to Fleetwood for the Barnett Lawsuit. A second letter was sent directly to Fleetwood on

6

March 19, 2019. (Copies of the February 8 and March 19, 2019 letters to Fleetwood are attached together as Exhibit F).

34.     The Cincinnati letters (Exh. F) asked Fleetwood to either withdraw any claim for coverage from Cincinnati or provide an explanation of why Fleetwood disagreed with Cincinnati's coverage conclusion. Fleetwood never responded to Cincinnati's letters.

**D.     The Cincinnati Policy Issued to Assured**

35.     Cincinnati issued policy no. ENP 015 05 22 to Assured Construction (the "Policy").  (A copy of the liability portions of Cincinnati's Policy for July 15, 2016 to July 16, 2017 is attached hereto as Exhibit G.)

36.     Fleetwood is not specifically named as an insured under the Policy.

37.     The Policy provides coverage for "property damage" (as defined therein) only if it was caused by an "occurrence" and only if that "property damage" occurred during Cincinnati's policy period. (Exh. G at CIN 8).

38.     The Policy was in effect until July 15, 2017, when Assured replaced the Cincinnati Policy with coverage from a separate insurer. The Policy provides no coverage for any alleged "property damage" to the Barnett home which occurred after July 15, 2017.

39.     Subject to its terms and conditions, the Policy provides additional insured coverage to certain entities that require such coverage in their contracts with Assured.

40.     The language that identifies the categories of entities ("Specified Relationships") that may qualify as additional insureds on the Policy is found on form GA 233 IL 02 07. (Exhibit G at CIN 39.)  It states in relevant part:

9. *Automatic Additional Insured - Specified Relationships*

   a. *The following is hereby added to SECTION II - WHO IS AN INSURED:*

      (1) *Any person or organization described in Paragraph 9.a.(2) below (hereinafter referred to as additional insured) whom you are required to add as an additional insured under this Coverage Part by reason of:*

         (a) *A written contract or agreement; or*

         (b) *An oral agreement or contract where a certificate of insurance showing that person or organization as an additional insured has been issued,*

      *is an insured, provided:*

         (a) *The written or oral contract or agreement is:*

            1) *Currently in effect or becomes effective during the policy period; and*

            2) *Executed prior to an "occurrence" or offense to which this insurance would apply; and*

                        *             *             *

      (2) *Only the following persons or organizations are additional insureds under this endorsement, and insurance coverage provided to such additional insureds is limited as provided herein:*

         (a) *The manager or lessor of a premises leased to you …*

         (b) *Any person or organization from which you lease equipment …*

         (c) *Any person or organization (referred to below as vendor) with whom you have agreed per Paragraph 9.a.(1) above to provide insurance, but only with respect to "bodily injury" or "property damage" arising out of "your products" which are distributed or sold in the regular course of the vendor's business, subject to the following additional exclusions:*

\*     \*     \*

> 2)    *This insurance does not apply to any insured person or organization:*
>
> > a)    *From whom you have acquired such products, or any ingredient, part or container, entering into, accompanying or containing such products …*

(d)    *Any state or political subdivision with which you have agreed per Paragraph 9.a.(1) above to provide insurance …*

(e)    *Any state or political subdivision with which you have agreed per Paragraph 9.a.(1) above to provide insurance …*

(f)    *Any person or organization with which you have agreed per Paragraph 9.a.(1) above to provide insurance, but only with respect to liability arising out of "your work" performed for that additional insured by you or on your behalf.*

\*     \*     \*

*A person or organization's status as an insured under this provision of this endorsement continues for only the period of time required by the written contract or agreement, but in no event beyond the expiration date of this Coverage Part. If there is no written contract or agreement, or if no period of time is required by the written contract or agreement, a person or organization's status as an insured under this endorsement ends when your operations for that insured are completed.*

(3)    *Any insurance provided to an additional insured designated under Paragraph 9.a.(2):*

(a)    *Subparagraphs (e) and (f) does not apply to "bodily injury" or "property damage" included within the "products-completed operations hazard";*

(b)    *Subparagraphs (a), (b), (d), (e) and (f) does not apply to "bodily injury", "property damage" or "personal and*

9

> *advertising injury" arising out of the sole negligence or willful misconduct of the additional insured or their agents, "employees" or any other representative of the additional insured; or*
>
> (c) *Subparagraph (f) does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of:*
>
>> 1) *Defects in design furnished by or on behalf of the additional insured; or*
>>
>> 2) *The rendering of, or failure to render, any professional architectural, engineering or surveying services, including:*
>>
>>> a) *The preparing, approving or failing to prepare or approve maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; and*
>>>
>>> b) *Supervisory, inspection, architectural or engineering activities.*

(Exh. G at CIN 39-42.)

41.     The Policy language relevant to contractual indemnity is found in Form GA 101 12 04. (Exhibit G at CIN 9.).  It states in relevant part:

> 2.     *Exclusions*
>
> *This insurance does not apply to:*
>
> *                    *                    *
>
> b.     *Contractual Liability*
>
> *"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:*
>
>> (1) *That the insured would have in the absence of the contract or agreement; or*

(2) *Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. When a claim for such "bodily injury" or "property damage" is made, we will defend that claim provided the insured has assumed the obligation to defend such claim in the "insured contract"….*

(Exh. G at CIN 9.)

## COUNT I
## DECLARATION THAT FLEETWOOD IS NOT AN ADDITIONAL INSURED
## <u>FOR THE PURPOSES OF THE BARNETT LAWSUIT</u>

42.     Cincinnati incorporates and re-alleges paragraphs 1-41 as if fully set forth herein.

43.     The Policy identifies the categories of entities that may qualify as additional insureds in section C. 9.a.(2)(a)-(f) of Form GA 233 IL 02 07.  (*See* Exh. G at CIN 40-41.)

44.     For purposes of the Barnett Lawsuit, Fleetwood does not qualify as an additional insured under Section C.9.a.(2)(a) through (e) because it does not fall into any of the specified relationships set forth in those sections of the Policy. (Exh. G at CIN 40-42.)

45.     Section C.9.a.(2)(f) of Form GA 233 IL 02 07 applies to persons or organizations with which Assured has agreed to provide insurance. Additional insured coverage under (f) is limited to liability arising out of Assured's "work" performed for Fleetwood. (Exh. G at CIN 42.)

46.     The Policy defines "your work" as follows, where "you" and "your" refer to Assured as the named insured:

11

26. *"Your work"*:

    a.    *Means:*

        (1)    *Work or operations performed by you or on your behalf; and*
        (2)    *Materials, parts or equipment furnished in connection with such work or operations.*

    b.    *Includes:*

        (1)    *Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and*
        (2)    *The providing of or failure to provide warnings or instructions.*

(Exh. G at CIN 27.)

47.    The Barnett Lawsuit alleges that Fleetwood is liable because the windows and doors which Fleetwood manufactured were defective. Assured did not design, manufacture or install those windows and doors. They are not Assured's "work," nor was any such "work" performed by Assured for Fleetwood. The Barnett Lawsuit does not allege that Assured performed work or operations on the Barnetts' home. Therefore, for the purposes of the Barnett Lawsuit, Fleetwood is not an additional insured under section C.9.a.(2)(f) of the Policy.

48.    Alternatively, even if Fleetwood otherwise qualified as an additional insured, its status as an additional insured ended (a) when Assured's operations on the Barnett home were completed or (b) when the Cincinnati Policy period ended on July 15, 2017. (Exh. G at CIN 41.) Any "work" that might have been performed by Assured "for" Fleetwood was completed when the windows were ordered in April 2014. The alleged "damage" that the Barnett Lawsuit connects with the Fleetwood products did not occur until much later. Therefore, for purposes of the claims against Fleetwood in the

Barnett Lawsuit, Fleetwood is not entitled to coverage as an additional insured under section C.9.a.(2)(f) of the Policy.

49.     For the purposes of the Barnett Lawsuit, Fleetwood is not entitled to coverage as an additional insured on the Policy that Cincinnati issued to Assured because Fleetwood does not qualify under any of the "Specified Relationships" required for that status and/or its status had ended by the time any "property damage" occurred.

**COUNT II**
**DECLARATION THAT ANY DAMAGES OWED BY FLEETWOOD**
**ARE NOT COVERED BY THE CINCINNATI POLICY**

50.     Cincinnati re-asserts paragraphs 1-49 as if fully set forth herein.

51.     Cincinnati denies that Fleetwood qualifies for coverage as additional insured under the Assured Policy. This Count II is asserted in the alternative, without waiving that denial.

52.     "Property damage" is defined to mean "physical injury to tangible property" or "loss of use of tangible property that is not physically injured." (Exh. G at CIN 27). Cincinnati does not owe coverage for any loss or "damage" that does not qualify as "property damage."

53.     The Policy provides coverage for "property damage" only if was caused by an "occurrence." (Exh. G at CIN 8.)  Cincinnati does not owe coverage to Fleetwood to the extent the damages alleged by the Barnetts did not arise out of an "occurrence".

54.     The Policy provides coverage for "property damage" only if it occurred during the Cincinnati policy period (Exh. G at CIN 8). The Barnett Complaint does not specifically allege any "property damage" attributable to the Fleetwood windows and doors. To the extent it does, most if not all of such "property damage" took place after

July 15, 2017. Cincinnati does not owe coverage to Fleetwood for any alleged "property damage" which took place after July 15, 2017, when coverage under the Cincinnati Policy ended.

55.    The Policy excludes coverage otherwise owed to an additional insured for liability that falls within the "products-completed operations hazard." (Exh. G at CIN 42, 26-27.)  Cincinnati does not owe coverage to Fleetwood to the extent the exclusion for "products-completed operations hazard" applies to the claims against Fleetwood.

56.    The Policy excludes coverage for additional insureds for liability that arises out of "defects in design furnished by the additional insured."  (Exh. G at CIN 42) The Barnett Lawsuit alleges that the Fleetwood windows and doors were defectively designed. (Exh. A at ¶ 21, 24, 37.) Cincinnati does not owe coverage to Fleetwood based on this exclusion.

57.    The Policy excludes coverage for damage to Fleetwood's own "product." (Exclusion G, Exh. G at CIN 12.)  Cincinnati does not owe coverage to Fleetwood to the extent the damages sought from Fleetwood are based on "property damage" to the Fleetwood products.

58.    The Policy excludes coverage for damage to Assured's "work." (Exclusion L, Exh. G at CIN 13.)  Cincinnati does not owe coverage to Fleetwood to the extent this exclusion applies to the claims against Fleetwood.

59.    The Policy excludes coverage for damage to "impaired property or property not physically injured." (Exclusion M, Exh. G at CIN 13.)  Cincinnati does not owe coverage to Fleetwood to the extent this exclusion applies to the claims against Fleetwood.

14

60.     The Policy excludes coverage for damage for any loss, cost or expense for the loss of use, repair, replacement, adjustment, removal or disposal of Fleetwood's product, its work, or "Impaired property." (Exclusion N, Exh. G at CIN 13.) Cincinnati does not owe coverage to Fleetwood to the extent this exclusion applies to the claims against Fleetwood.

61.     For purposes of the Barnett Lawsuit, there is no coverage for Fleetwood (including defense or indemnity coverage) under the Policy issued to Assured for one or more of the reasons set forth above.

62.     The exclusions addressed in this Count II, singly or in combination, bar all coverage for the damages sought from Fleetwood in the Barnett Lawsuit. Cincinnati is therefore entitled to a declaration that it has no obligation to provide coverage to Fleetwood for liability that is asserted against Fleetwood in the Barnett Lawsuit.

### COUNT III
### DECLARATION THAT CINCINNATI OWES NO COVERAGE FOR ANY CONTRACTUAL INDEMNITY OBLIGATION FROM ASSURED TO FLEETWOOD

63.     Cincinnati re-asserts paragraphs 1-62 as if fully set forth herein.

64.     Cincinnati denies that Fleetwood is an additional insured, or that any of the claims against Fleetwood are covered by the Policy. This Count III is asserted in the alternative, without waiving any denials.

65.     The Policy excludes coverage for indemnity obligations assumed by the insured by reason of a contract or agreement. (Exh. G at CIN 9). The exclusion does not apply to liability assumed by the insured as part of an "insured contract," so long as

the relevant "property damage" occurs after the execution of the contract or agreement. (Exh. G at CIN 9).

66.    The Policy defines "insured contract", in relevant part, as follows:

>    f.    *That part of any other contract or agreement pertaining to your business … under which you assume the tort liability of another party to pay for "bodily injury", "property damage" or "personal and advertising injury" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.*

(Exhibit G at CIN 23).

67.    The 2012 and 2014 Agreements between Fleetwood and Assured do not qualify as "insured contracts" within the meaning of the Policy because they do not require Assured to assume Fleetwood's tort liability.

68.    Assured did not sign any agreements with Fleetwood after July 31, 2014, and objected to the terms of the 2016 and 2018 agreements presented by Fleetwood for Assured's signature. The unsigned 2016 and 2018 agreements therefore do not apply to Assured and do not meet the definition of "insured contract" under the policy. (Exh. G at CIN 24).

69.    As the "insured contract" exception to the exclusion found in section I.A.2.b of Form GA 101 12 04 (Exh. G at CIN 24) does not apply in this case, therefore the Contractual Liability exclusion (Exclusion B) applies to bar coverage for Fleetwood under the Assured policy.

70.    Cincinnati is entitled to a declaration that it has no obligation to provide coverage to Fleetwood for the alleged liability of Fleetwood in the Barnett Lawsuit.

WHEREFORE, for the foregoing reasons, Cincinnati moves this Honorable Court for an order declaring that:

1.      For the purposes of the Barnett Lawsuit, Fleetwood is not an additional insured on the Policy that Cincinnati issued to Assured.

2.      Even if Fleetwood qualifies as an additional insured under the Assured Policy, coverage for Fleetwood is excluded by other terms and conditions of the Policy.

3.      Cincinnati has no obligation to defend or indemnify Fleetwood for the Barnett Lawsuit.

4.      Granting Cincinnati such other and further relief that the Court deems just under the circumstances.

Respectfully submitted,

/s/Hope G. Nightingale_____

Hope Nightingale (#06184864)
Mary Beth Canty (#6298286)
Litchfield Cavo LLP
303 W. Madison, Suite 300
Chicago, IL  60606
312-781-6614 (Nightingale)
312-781-6629 (Canty)
312-781-6630 (Fax)